UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**MARK NELSON,**

                **Plaintiff,**

v.                                                                           Case No. 23-CV-1567

**KIRA LABBY,**

                **Defendants.**

## DECISION AND ORDER

Plaintiff Mark Nelson, who is representing himself and currently confined at Redgranite Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. Nelson was allowed to proceed on a claim against defendant Dr. Kira Labby pursuant to the Eighth Amendment for failing to properly address his broken shoulder and related pain. Dr. Labby filed a motion for summary judgment, which is fully briefed and ready for a decision. (ECF No. 31.) The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 27, 29.)

### FACTS

The facts are largely undisputed. On February 14, 2024, Nelson was examined in the Health Services Unit (HSU) after he tripped over a fan cord in the bathroom, sustaining injuries to his head, neck, and left shoulder. (ECF No. 33, ¶ 10.) The nurse examining him conferred with an on-call doctor (neither are identified nor defendants), and Nelson was sent to the ThedaCare Medical Center-Berlin Emergency Room. (*Id.*, ¶

11.) Nelson's shoulder was x-rayed, "which showed a closed displaced fracture of surgical neck of left humerus." (*Id.*, ¶ 13.) The ER doctor gave Nelson a prescription for Hydrocodone Acetaminophen. (*Id.*, ¶ 14.) Nelson's discharge instructions "recommended that Nelson use a sling, follow up with orthopedics within the week, return to the emergency room if needed, and use Tylenol or Vicodin for pain." (*Id.*, ¶ 15.)

The next day, February 15, 2022, Dr. Labby learned that Nelson had been seen in the ER. (ECF No. 33, ¶ 17.) That same day she reviewed the medical records and other paperwork that was sent from the ER. (*Id.*) Also that day Dr. Eric Nelson (unrelated and not a defendant), who was an orthopedic specialist at Waupun Memorial Hospital, reviewed Nelson's medical records and documentation from the ER. (*Id.*, ¶ 19.) Dr. Nelson recommended that Nelson use a sling and have additional x-rays in one week. (*Id.*, ¶ 20.) He also scheduled a telemedicine appointment with Nelson for a few days after the second set of x-rays were taken. (*Id.*) He further opined that Nelson did not need surgery to correct the fracture. (*Id.*, ¶¶ 20-22.)

On February 16, 2022, based on Dr. Nelson's recommendations, Dr. Labby ordered a second set of x-rays for Nelson. (ECF No. 33, ¶ 23.) She also ordered another telemedicine appointment with Dr. Nelson. (*Id.*) On February 18, 2022, Nelson went to the HSU for rib pain, where he was examined by an unidentified nurse. (*Id.*, ¶ 26.) Nelson complained that he no longer had the narcotic pain medicine he was prescribed at the ER. (*Id.*) The nurse contacted the on-call doctor, who extended the prescription. (*Id.*) Nelson took narcotic pain medicine through February 22, 2022. (*Id.*, ¶ 16.)

On February 24, 2022, Nelson had a second set of x-rays, "which showed a proximal left humerus fracture" and evidence of "thin bones". (ECF No. 33, ¶ 27.) That same day Dr. Labby wrote Nelson a letter explaining his x-ray results, stating that his "X-ray of course shows the fracture in your upper arm. It also mentions that your bones appear 'thin'—for this reason I'm sending you a Calcium-Vitamin D supplement to take twice daily. We will meet next week, and you'll see the Orthopedic Surgeon soon as well." (*Id.*, ¶ 28.)

On February 28, 2022, Nelson saw Dr. Labby in person for a follow up appointment. (ECF No. 33, ¶ 30.) Dr. Labby states that Nelson reported that his pain was tolerable when using Tylenol. (*Id.*) She also asserts that, had Nelson complained that the Tylenol wasn't helping, she "would have offered to prescribe something stronger, such as Tramadol ('a milder opioid') or muscle relaxants." (*Id.*, ¶¶ 31-32.) Nelson disputes this, stating that on several occasions he complained that Tylenol was not working and that Dr. Labby never offered Tramadol or muscle relaxants. (ECF No. 47, ¶¶ 13-14.)

On March 7, 2022, Nelson had another telemedicine appointment with Dr. Nelson, who after the appointment recommended "an urgent consult by a tertiary level fracture specialist at the University of Wisconsin." (ECF No. 33, ¶¶ 34-35.) On March 14, 2022, HSU received Dr. Nelson's notes and related medical records from the telemedicine appointment, and Dr. Labby reviewed them on March 17, 2022. (*Id.*, ¶ 36.) That same day she wrote to non-defendants Cathy Brasch and Lynnae Sievert, who worked in HSU administration, requesting assistance to get Nelson scheduled

3

with the specialist at the University of Wisconsin (UW) Orthopedics department "as soon as possible." (*Id.*, ¶ 37.) Brasch sent an urgent referral that same day. (*Id.*, ¶ 38.)

On March 25, 2022, Nelson saw non-defendant Dr. Christopher Domes, an orthopedic surgeon at UW Orthopedics. (ECF No. 33, ¶ 39.) Nelson told Dr. Domes that his "shoulder feels terrible when he tries to move it and is convinced that he needs it fixed or 'reset' with a surgery." (*Id.*, ¶ 40.) Dr. Domes disagreed, finding that Nelson's shoulder "was already starting to heal in a position that we think will be quite functional for him in the future. We redirected his expectations at today's visit, and stated that although he will likely have some stiffness of the shoulder, we do think that he would be able to attain a very functional, pain-free shoulder in the future." (*Id.*) Dr. Domes recommended that Nelson use physical therapy to increase his range of motion in his shoulder and that he take 5 mg of Oxycodone for his first two weeks of physical therapy to address the pain. (*Id.*, ¶ 41.) He also instructed Nelson to keep using his sling and recommended that he have another appointment with him in four-to-six weeks along with another set of x-rays. (*Id.*)

On March 28, 2022, Dr. Labby ordered physical therapy for Nelson but did not order the Oxycodone because opioids such as Oxycodone are generally not prescribed in a prison setting due to security and safety concerns. (ECF No. 33, ¶ 42.) It is unclear from the record if Dr. Labby prescribed any pain medication in lieu of the Oxycodone at that time.

On April 4, 2022, Nelson attended physical therapy with non-defendant Robert Rhodes. (*Id.*, ¶ 43.) Rhodes recommended several exercises and gave Nelson a "Home

4

Exercise Plan" (HEP) to do when he was in his cell. (*Id.*) He also advised that Nelson attend physical therapy two times a week for three weeks. (*Id.*)

On April 13, 2022, Nelson went to physical therapy and admitted to Rhodes that he struggled with the HEP and that he was using some of his own exercises instead. (ECF No. 33, ¶¶ 44-45.) During the appointment it was clear to Rhodes that Nelson had not been doing the exercises. (*Id.*, ¶ 46.) Dr. Labby asserts that, because Nelson did not comply with Rhodes's instructions, physical therapy was unsuccessful. (*Id.*, ¶ 48.) Nelson maintains that he told Rhodes that he "had a lot of pain when I did the exercises" so he did not do them "all the time as it caused severe pain in my shoulder." (ECF No. 46, ¶ 45.) He also was in too much pain to comply with the HEP, which is why physical therapy was unsuccessful (*Id.*, ¶¶46-48.)

On April 18, 2022, Nelson refused physical therapy and was discharged at his request because physical therapy "just makes the pain worse." (ECF No. 33, ¶¶ 50-51.) On April 21, 2022, Dr. Labby examined Nelson in a follow up appointment. (*Id.*, ¶ 52.) Nelson had had x-rays that morning, and Dr. Labby reviewed them with him, noting that "his fracture was healing in near-anatomic alignment," meaning he was healing appropriately. (*Id.*, ¶¶ 52-54.) In Dr. Labby's opinion, "resetting" the shoulder would not be appropriate. (*Id.*, ¶ 55.)

At that appointment Nelson informed Dr. Labby that he was experiencing "on-going pain." (ECF No. 33, ¶ 56.) Dr. Labby states she "offered him staff-controlled medication such as Flexeril or Cyclobenzaprine, which is a muscle relaxant." (*Id.*) She told him that this could be used prior to completing his HEP. According to Dr. Labby,

5

Nelson declined. (*Id.*) Nelson states that Dr. Labby never offered him muscle relaxants. (ECF No. 46, ¶ 56.) Dr. Labby also instructed Nelson to continue to use NSAIDs and Acetaminophen and topical rub to manage his pain. (ECF No. 33, ¶ 60.)

On April 29, 2022, Nelson had a follow up appointment with Dr. Domes. (ECF No. 33, ¶ 61.) Dr. Domes observed that Nelson "had stable x-rays and had steady improvement in pain." (*Id.*, ¶ 62.) Dr. Domes recommended that Nelson continue to try physical therapy exercises to improve his range of motion and that Nelson come back in four-to-six weeks for another follow-up with x-rays. (*Id.*, ¶¶ 63-64.)

On May 26, 2022, Dr. Labby examined Nelson's shoulder, noting that his range of motion and amount of swelling were "slightly improved". (ECF No. 33, ¶ 65.) She told Nelson to continue taking Acetaminophen for the pain and that a follow up with Dr. Domes would be scheduled. (*Id.*, ¶ 66.)

On June 24, 2022, Nelson saw Dr. Domes for a follow up, and Dr. Domes noted that "Nelson's x-rays showed evidence of healing, but Nelson continued to experience significant limitations in range of motion." (ECF No. 33, ¶ 68.) Dr. Domes explained to Nelson that his pain and limited range of motion was likely due to not moving his shoulder muscle for several months. (*Id.*, ¶ 69.) Dr. Domes felt that "non-operative management of the fracture" was appropriate and recommended that Nelson try formal physical therapy again. (*Id.*, ¶ 70.) He also prescribed Nelson 30 tabs of Oxycodone to use prior to physical therapy for pain management. (*Id.*) He recommended that Nelson come back in six weeks for a follow up. (*Id.*)

On June 30, 2022, Dr. Labby wrote a letter to Nelson explaining that she could not order the Oxycodone due to security and safety concerns, but she offered to order him muscle relaxants to use prior to his physical therapy sessions. (ECF No. 33, ¶ 71.) Nelson states that Dr. Labby told him she would only give him muscle relaxants if he would agree to physical therapy. (ECF No. 46, ¶ 71.) On July 11, 2022, Nelson saw Dr. Labby for another follow up, where he reported that he was doing daily exercises and his extension and internal rotation of his shoulder was "a little better." (*Id.*, ¶ 72.) Nelson was supposed to go see Dr. Domes on July 29, 2022, but he refused to go to the appointment because "he did not want to waste his day on a trip." (*Id.*, ¶ 73.)

While Nelson does not dispute the timeline of events or the number of medical visits and treatments he received, he does dispute that Dr. Labby appropriately managed his pain. He states that Dr. Labby "denied any and all pain medication except Tylenol or Ibuprofen" and ignored Dr. Domes's recommendation for opioids. (ECF No 46, ¶ 76.) He states that Dr. Labby's refusal to give appropriate pain medication caused his muscle atrophy and stiffness and had she given him opioids or muscle relaxants he would not have been in pain. (*Id.*, ¶ 80.)

Additionally, Nelson states that Dr. Labby inappropriately only focused on his fractured arm as the cause of his shoulder pain and did not explore other possibilities. (ECF No. 47, ¶ 37.) Once she eventually referred him to non-defendant Dr. Choi (whose first name is not mentioned) for pain management in October 2023, the real cause of his pain was discovered—a torn rotator cuff. (*Id.*, ¶ 38.) Dr. Labby notes that

7

she is a general practitioner and the specialist, Dr. Domes, would have been better equipped to diagnose the source of Nelson's pain. (ECF No. 49 at 2.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'"

8

Case 2:23-cv-01567-WED Filed 01/24/25 Page 8 of 14 Document 51

*Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Nelson asserts that Dr. Labby violated his Eighth Amendment rights when she failed to treat his shoulder pain and did not diagnose his torn rotator cuff. A prison official violates the Eighth Amendment when she is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). There is no dispute that a broken shoulder is an objectively serious medical condition.

To demonstrate deliberate indifference, a plaintiff must show "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). The plaintiff also "must show more than mere evidence of malpractice." *Id.* The plaintiff must show that the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment." *Stallings v. Liping Zhang*, 607 Fed. Appx. 591, 593 (7th Cir. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)).

It is undisputed that Dr. Labby provided continuous care to Nelson. Nelson, however, argues that her treatment of his pain and diagnosis were inappropriate and amount to a constitutional violation. Even if a plaintiff is provided some medical care,

9

deliberate indifference may be shown when a "prison official, having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio,* 792 F.3d 768, 777 (7th Cir. 2015).

No reasonable jury could conclude that Dr. Labby's refusal to provide pain medication other than NSAIDs and Acetaminophen was blatantly inappropriate. A doctor's decision to discontinue or provide select medication at certain times is generally an exercise of professional judgment unless there is evidence that the doctor was "withholding prescribed pain medication as a 'gratuitous cruelty.'" *Myrick v. Gohde*, Case No. 17-cv-603-wmc, 2020 WL 5074411 at *22 (W.D. Wis. Aug. 27, 2020) (quoting *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002). Additionally, the Seventh Circuit Court of Appeals has established that, where a plaintiff receives steady and extensive medical care that includes tests, x-rays, specialist visits, and hospital visits, a doctor's decision to provide certain medications or treatments is an exercise of professional judgment and a plaintiff's disagreement with that decision, without evidence that the decision was blatantly inappropriate, does not amount to a constitutional violation. *See Thompson v. Godinez*, 561 Fed. App'x 515, 518-519 (7th Cir. 2014) (listing cases).

Nelson argues that security concerns were not a viable basis for Dr. Labby ignoring Dr. Domes's recommendation that he use Oxycodone before physical therapy. However, doctors in prison settings can and should take into account institutional

10

security concerns when contemplating introducing narcotics into the prison setting. *See Myrick* 2020 WL 5074411 at *22. Also, as long as her decision not to follow the advice of a specialist was a reasonable exercise of professional judgment, Dr. Labby was not obligated to follow the recommendation of Dr. Domes. *Donald v. Wexdford Health Sources, Inc.*, 982 F.3d 451, 462-463 (7th Cir. 2020). In short, "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Dr. Labby was not deliberately indifferent to Nelson's pain.

As for Nelson's contention that Dr. Labby failed to diagnose his torn rotator cuff, Nelson was not allowed to proceed on a deliberate indifference claim on that basis. Nelson is limited to the scope of the screening order. *See Werner v. Hamblin*, Case No. 12-C-0096, 2013 WL 788076 at *2 (E.D. Wis. March 1, 2013).

Nelson's response materials only briefly touch on his original claim—that Dr. Labby's undue delay in having him see a specialist in person constitutes deliberate indifference—and no reasonable factfinder could conclude that Dr. Labby's decision to have Nelson initially examined in a telemedicine appointment was blatantly inappropriate. A medical professional's delay of necessary treatment amounts to deliberate indifference only when there is evidence that the delay aggravated the plaintiff's condition or needlessly prolonged the plaintiff's pain. *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012). It is undisputed that Nelson was examined in person by an orthopedic surgeon within 6 weeks of breaking his arm. Such a period on its face

11

is not unreasonable. By that time, Nelson had received multiple sets of x-rays, had been seen by a doctor in the emergency room, had had his records reviewed by an orthopedic specialist, had multiple telemedicine appointments with an orthopedic specialist, and had seen the defendant numerous times in person.

Additionally, the undisputed evidence shows that the six-week period before he was seen by the orthopedic surgeon did not aggravate Nelson's condition and that he was healing well. Nelson may have been in pain, but seeing the specialist in person did not result in a change in his pain regimen, so treatment of his pain was not needlessly prolonged. "To say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes*, 95 F.3d at 592.

Because Nelson does not present any evidence that Dr. Labby's treatment decisions were blatantly inappropriate, summary judgment is granted in Dr. Labby's favor.

## CONCLUSION

For the foregoing reasons, Dr. Labby's motion for summary judgment is granted. The court need not address Dr. Labby's argument that she was entitled to qualified immunity. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 21) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 24th day of January, 2025.

BY THE COURT

*William E. Duffin*

WILLIAM E. DUFFIN
United States Magistrate Judge

14

Case 2:23-cv-01567-WED    Filed 01/24/25    Page 14 of 14    Document 51